UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

EUGENE DOKES-WILSON,          )
                             )
            Plaintiff,        )
                             )
        vs.                   )          No. 4:05-CV-1548 CEJ
                             )
MICHAEL J. ASTRUE[1],         )
Commissioner of Social Security, )
                             )
            Defendant.        )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

### I.   Procedural History

Plaintiff Eugene Dokes-Wilson applied for disability benefits on June 19, 1995 under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 et seq., 1381 et seq. The application was denied, and the Appeals Council affirmed the denial on January 30, 1998. Plaintiff then filed an application for supplemental security income (SSI) benefits on March 5, 1998, pursuant to Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 et seq., 1381 et seq. Upon review by Administrative Law Judge James Steitz, plaintiff's application was approved on December 11, 1998.

---

[1] Michael J. Astrue became Commissioner of Social Security on February 13, 2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should be substituted, therefore, for Commissioner Jo Anne B. Barnhart as Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

On January 10, 2003, plaintiff was notified that a finding had been made that his disability had ceased to exist and, thus, his benefits would be terminated on March 1, 2003. (Tr. 16). The determination was affirmed on reconsideration. (Tr. 16).

Plaintiff requested a hearing, which was held before Administrative Law Judge Mitchell F. Stevens on March 11, 2004. (Tr. 37-43). Plaintiff was represented by counsel at the hearing. (Tr. 37). ALJ Stevens issued an unfavorable decision on August 24, 2004, finding that plaintiff's disability had ended on January 1, 2003, and his entitlement to SSI had ended March 1, 2003. (Tr. 23).

The Appeals Council denied plaintiff's request for review on July 26, 2005. (Tr. 6). Accordingly, the ALJ's decision stands as the Commissioner's final decision. See 42 U.S.C. § 405(g). Plaintiff timely filed his complaint in this Court on September 23, 2005. Plaintiff proceeds in this Court represented by counsel.

## II.  **Evidence Before the ALJ**

At the time of his hearing, plaintiff was a 46-year old man with four adult children. (Tr. 52, 282). He was a high-school graduate and had worked in the past as a welder and laborer. (Tr. 52, 181-82).

Plaintiff was the sole witness at the March 11, 2004 hearing. (Tr. 38-42). The sole subject of his testimony, and of the hearing, was his employment at St. Alexius Hospital as a client taxi driver for approximately ten months in 2002 and 2003.[2] (Tr. 38-42).

_____

[2] The transcript erroneously refers to the facility that employed plaintiff as "St. Alexian," but it was in fact St.

2

Plaintiff testified that he was participating in an outpatient drug and alcohol treatment program at the hospital when staff members approached him about the driver position. (Tr. 38). He testified he was unsure whether he could perform the job's responsibilities, because he was on medication which made him tired, but that he accepted the job nonetheless. (Tr. 39).

Plaintiff's job duties were to transport clients between their homes and an outpatient treatment facility. (Tr. 40). Plaintiff customarily worked from about 7:00 a.m. to 9:00 a.m. and then in the afternoon from about 3:00 p.m. to 5:30 p.m. (Tr. 40). Plaintiff testified he experienced some difficulty performing his duties, including back pain and fatigue due to his sleep apnea. (Tr. 41). Plaintiff was discharged for disciplinary reasons on April 30, 2003. (Tr. 41).

Plaintiff's total earnings in the years 1995 through 2001 were zero. (Tr. 114). In 2002, plaintiff's earnings were $8133.20; and in 2003, his earnings were $7540.65. (Tr. 123-24).

III.     **Medical Evidence**

The Court has not been presented with the evidence that was submitted to ALJ Steitz is not before this Court.  However, his 1998 decision and findings are before the Court.  Because the Court must review ALJ Stevens' finding that plaintiff's medical condition

---

Alexius Hospital, where plaintiff was undergoing substance abuse treatment. (Tr. 154-57). Plaintiff testified that the St. Alexius facility was bought out by Preferred Family Health Care during the time he worked there. (Tr. 38).

improved between 1998 and 2004, a brief summary of the 1998 decision follows.

ALJ Steitz based his favorable decision on plaintiff's psychiatric diagnoses of schizoaffective disorder, antisocial personality disorder, obsessive compulsive disorder, depressive disorder, mixed personality disorder with features of antisocial and borderline personality, and cocaine and alcohol abuse.[3] (Tr.

---

[3] Schizoaffective disorder is characterized by "poor occupational functioning, a restricted range of social contact, difficulties with self-care, and increased risk of suicide" . . . . Anosognosia (i.e. poor insight) is also common. . . [and] There may be associated Alcohol and other Substance-Related Disorders." Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision (American Psychiatric Association, 2000) (hereinafter DSM-IV-TR), 321. The diagnostic criteria for the disorder are "An uninterrupted period of illness during which . . . there is either a Major Depressive Episode, a Manic episode, or a Mixed Episode concurrent with symptoms that meet Criterion A for Schizophrenia." DSM-IV-TR at 321, 323.
The diagnostic criteria for antisocial personality disorder are "a pervasive pattern of disregard for and violation of the rights of others occurring since age 15 years, as indicated by" three or more of the following: "failure to conform to social norms with respect to lawful behaviors," "deceitfulness . . . impulsivity or failure to plan ahead . . . irritability and aggressiveness . . . reckless disregard for safety of self or others . . . consistent irresponsibility, as indicated by repeated failure to sustain consistent work behavior or honor financial obligations [and] lack of remorse." DSM-IV-TR at 706.
The diagnostic criteria for obsessive-compulsive disorder are obsessions, defined as: "recurrent and persistent thoughts, impulses, or images that are experienced . . . as intrusive and inappropriate and that cause marked anxiety or distress." Id. at 462. The obsessions "are not simply excessive worries about real-life problems." Id. "[T]he person attempts to ignore or suppress" the obsessions, but also "recognizes that [they] are a product of his or her own mind (not imposed from without . . .)." Id. The disorder also involves compulsions, defined as: "repetitive behaviors (e.g. hand washing, ordering, checking) that the person feels driven to perform in response to an obsession, or according to rules that must be applied rigidly." Id. Finally, the compulsions "are aimed at preventing or reducing distress or preventing some dreaded event or situation," but "are not

53). A psychiatrist found that plaintiff's Global Assessment of Functioning (GAF) score was 35, indicating major impairment in several areas such as avoiding others and being unable to work.[4] (Tr. 53).

ALJ Steitz also based his favorable decision on plaintiff's credibility, his inability to work, and his lack of transferable skills, including residual functional capacity and vocational factors. (Tr. 54-55). Although two psychiatrists had noted plaintiff's drug and alcohol abuse, the ALJ found that substance abuse was not a material factor in plaintiff's disability. (Tr. 55). The ALJ recommended periodic re-evaluation of plaintiff's disability status. (Tr. 55).

The present record contains numerous documents relating to plaintiff's physical medical problems, including sleep apnea, spinal degeneration, a dog bite, and recurring acne. (Tr. 331, 346, 357-64, 495, 513). Plaintiff was adjudged disabled in 1998 on the

---

connected in realistic way with what they are designed to neutralize or prevent or are clearly excessive." Id.

Depressive disorder-not otherwise specified involves minor depressive disorder ("episodes of at least 2 weeks of depressive symptoms"), recurrent brief depressive disorder ("episodes lasting from 2 days up to 2 weeks, occurring at least once a month for 12 months"), and/or "situations in which a clinician has concluded that a depressive disorder is present but is unable to determine whether it is primary, due to a general medical condition, or substance induced." Id. at 381-82.

Mixed personality disorder is not a disorder recognized by the American Psychiatric Association, but the diagnostic criteria for borderline personality disorder include: "A pervasive pattern of instability of interpersonal relationships, self-image, and affects, and marked impulsivity beginning by early adulthood and present in a variety of contexts." Id. at 710.

[4] A Global Assessment Functioning score is a score on a 0-100 rating scale of psychological functioning. DSM-IV-TR at 34.

basis of his psychiatric condition, not physical medical conditions. (Tr. 52-56). The Court reviews whether plaintiff's mental condition has improved since 1998. Therefore, the Court need not consider medical evidence relating to plaintiff's physical health and will limit itself to a review of the psychiatric medical evidence in the record. The following evidence was before ALJ Stevens and served as the basis of the decision now being reviewed by this Court.

Plaintiff was hospitalized for four days in November 2001 for a relapse into cocaine and alcohol abuse, but did not display signs of psychosis or depression. (Tr. 15, 234-45). He was discharged with a GAF of 55, and Mohammed Kabir, M.D., recommended plaintiff seek long-term substance abuse treatment.[5] (Tr. 237). Between January and June 2002, plaintiff successfully completed a substance abuse rehabilitation program.[6] (Tr. 15, 403-405).

On January 10, 2002, Cindy Keyte, M.S.W., L.C.S.W., a social worker at the St. Alexius Hospital Comprehensive Substance Abuse Treatment and Rehabilitation Program (CSTAR), evaluated plaintiff. (Tr. 395-400). Ms. Keyte noted that plaintiff had referred himself to the program. (Tr. 396). Ms. Keyte diagnosed plaintiff with cocaine and alcohol dependence; found that his psychosocial and

---

[5] A GAF score in the 51-60 range indicates "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34.

[6] The record shows that plaintiff's caseworker "encouraged him to get a job" and plaintiff "actually found a job by graduation." (Tr. 404).

environmental   problems   included   limited   sober   supports,
unemployment, limited income, nonpayment of child support; and
found a GAF score of 47.[7] (Tr. 399).

Beginning in October 2001, and possibly earlier, plaintiff was
a patient of Rolf Krojanker, M.D., a psychiatrist at Hopewell
Center, a mental health clinic. (Tr. 15, 223-28).  The center's
records show that plaintiff had been a patient there since March
22, 1996. (Tr. 233). Dr. Krojanker diagnosed plaintiff with cocaine
and alcohol abuse and schizoaffective disorder with symptoms that
included anxiety, insomnia, and depression. (Tr. 15, 229-30). In
September 2002, Dr. Krojanker continued this earlier diagnosis and
found plaintiff's GAF score was 40.[8] (Tr. 229).

Plaintiff was evaluated on September 27, 2002 by Dr.
Krojanker, who continued his diagnosis of schizoaffective disorder,
cocaine and chemical dependency, "social character traits," and
history of head injury. (Tr. 229). Dr. Krojanker indicated a GAF
rating of 40 and prescribed the following medications: 50 mg

---

[7] A GAF score in the 41-50 range indicates "Serious symptoms
(e.g., suicidal ideation, severe obsessional rituals, frequent
shoplifting) OR any serious impairment in social, occupational or
school functioning (e.g., no friends, unable to keep a job)."
DSM-IV-TR at 34.

[8] A GAF score in the 31-40 range indicates "Some impairment
in reality testing or communication (e.g., speech is at times
illogical, obscure, or irrelevant) OR major impairment in several
areas, such as work or school, family relations, judgment,
thinking, or mood (e.g., depressed man avoids friends, neglects
family, and is unable to work . . . .)." DSM-IV-TR at 34.

trazodone at night, Trileptal 150 mg in the morning and 300 mg at night, and Wellbutrin, 150 mg twice daily.[9] (Tr. 229).

On November 21, 2002, L. Lynn Mades, Ph.D. performed a consultative psychological evaluation of plaintiff. (Tr. 280). Dr. Mades diagnosed plaintiff with depressive disorder, alcohol and cocaine abuse, and personality disorder-not otherwise specified. (Tr. 284). Dr. Mades determined that plaintiff had "mild to moderate" psychosocial and environmental problems, including a "[h]istory of interpersonal and legal problems, limited support system, [and] health problems." (Tr. 284). Dr. Mades found plaintiff's GAF score was 70.[10] (Tr. 284).

Dr. Mades noted "there was evidence of mild psychological impairment that would limit the claimant from engaging in sustained employment. The claimant appears able to perform simple, manual tasks with limited interactions with others. Occasional interruptions appear likely to occur from mental disorder on a sustained basis." (Tr. 284).

Dr. Krojanker again saw plaintiff on November 22, 2002 and reported that plaintiff was depressed because he was breaking up with a significant other and had missed an appointment. (Tr. 230).

---

[9] Trazodone is an antidepressant and is also prescribed for insomnia. (Tr. 179). Trileptal is an antiepileptic, and Wellbutrin is an antidepressant. Physician's Desk Reference, 61st ed. (2007) (hereinafter PDR), 2300, 1607.

[10] A GAF score in the 61-70 range indicates "Some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR at 34.

Dr. Krojanker continued the trazodone, Trileptal, and Wellbutrin prescriptions. (Tr. 230).

On November 22, 2002, a case manager at Hopewell noted that plaintiff's GAF score was then 50. (Tr. 223).

Plaintiff, who had not worked regularly since 1987, held a job as a driver from July 2002 to April 2003. (Tr. 16). On January 10, 2003, he was notified his SSI benefits would cease on March 1, 2003. (Tr. 16).

On December 4, 2003, Dr. Krojanker filled out a Mental Medical Source Statement form. (Tr. 353-56). The form was to be completed by ranking the level of the plaintiff's limitation in the categories "Activities of daily living", "Social functioning," and "Concentration, persistence, or pace." Under each category was a list of specific activities for which plaintiff's ability level was to be assessed. The list included activities such as, "cope with normal work stress," "behave in an emotionally stable manner," "maintain attention and concentration for extended periods," and "relate in social situations."  For each activity, the respondent was asked to rate the level of limitation as either none, mild, moderate, marked, or extreme. (Tr. 353).  The ratings were defined as follows:

> Mild: Minimal functional limitation, but no more.  A problem exists, but it is not significant of the patient's mental ability to do basic activities.

> Moderate: Significant functional limitation that is more than minimal.

> Marked:  Limitation that seriously interferes with the ability to function independently, appropriately, and

effectively. This level of limitation is incompatible with the [ability] to perform the function 8 hours a day, 5 days a week, or on an equivalent schedule.

Extreme:  A limitation that totally precludes the patient's ability to usefully perform the designated activity or to sustain performance of the designated activity.

(Tr. 353).

For twelve of the seventeen activities listed on the form, Dr. Krojanker rated plaintiff's level of limitation as "marked." Plaintiff's limitation levels were "moderate" in three activities (ability to interact with the general public, to understand and remember simple instructions, and to make simple work-related decisions) and "extreme" in two activities (ability to complete a normal workday and workweek without interruptions from symptoms and ability to perform at a consistent pace without an unreasonable number and length of rest periods).  (Tr. 353-56).

Dr. Krojanker found that plaintiff was markedly limited in his ability to cope with normal work stress, function independently, behave in an emotionally stable manner, and maintain reliability. (Tr. 353).  He found that plaintiff was markedly limited in his ability to relate in social situations, accept instructions and respond to criticism, and maintain socially acceptable behavior. (Tr. 354). He also found plaintiff markedly limited in his ability to maintain regular attendance and be punctual, to maintain attention and concentration for extended periods, to sustain an ordinary routine without special supervision, to respond to changes

in work setting, and to work in coordination with others. (Tr. 354).

Dr. Krojanker wrote that in the preceding year plaintiff had experienced three "episodes of decompensation," defined as "an exacerbation or temporary increase in symptoms or signs accompanied by a loss of adaptive functioning." (Tr. 355). Dr. Krojanker also wrote that plaintiff had a "substantial loss of ability" to make simple work-related decisions; to respond appropriately to supervision, co-workers, and usual work situations; and to deal with changes in a routine work setting. (Tr. 355). Plaintiff did not have a substantial loss of ability to understand, remember, and carry out simple instructions. (Tr. 355). Dr. Krojanker opined that the limitations listed on the form had lasted 12 continuous months, or could be expected to last 12 continuous months, at the assessed severity, and that the limitations had existed at the assessed severity since before 1998. (Tr. 355).

Dr. Krojanker provided on the form his most recent diagnosis of plaintiff's impairments, including schizoaffective disorder and personality disorder. (Tr. 356). Finally, he noted that plaintiff's most recent GAF (dated December 2003) was a score of 50, and that his highest GAF in the previous year was a score of 50. (Tr. 356).

On April 29, 2004, L. Lynn Mades, Ph.D. performed a consultative psychological evaluation of plaintiff. (Tr. 528-33). Dr. Mades diagnosed plaintiff with depressive disorder-not otherwise specified, alcohol and cocaine abuse, personality disorder-not otherwise specified, and mild to moderate psychosocial

and environmental problems with a history of interpersonal and legal problems, limited support system, and health problems. (Tr. 532). Dr. Mades found plaintiff's GAF score was 70-75.[11] (Tr. 532).

On June 26, 2004, Georgia Jones, M.D., performed a consultative psychological examination of plaintiff. (Tr. 536-40). Dr. Jones diagnosed plaintiff with alcohol and cocaine dependence in long-term, full remission, and with psychotic disorder-not otherwise specified, most likely "induced by substance use." (Tr. 540). Dr. Jones did not note her assessment of plaintiff's personality disorders appearing in Axis II of the DSM-IV multiaxial system used to assess mental health. (Tr. 540). The only psychosocial and environmental problems Dr. Jones found was as follows: "Current psychosocial stressors include financial stress." (Tr. 540). Dr. Jones found plaintiff's GAF score was 65-70. (Tr. 540).

Dr. Jones completed a medical source statement of ability to do work-related activities on June 28, 2004. (Tr. 541-42). The form defined "slight" as "some mild limitations in this area, but the individual can generally function well." (Tr. 541). "Moderate" meant "moderate limitation in this area, but the individual is still able to function satisfactorily." (Tr. 541). "Marked"

---

[11] A GAF score in the 71-80 range indicates: "If symptoms are present, they are transient and expectable reactions to psychological stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)." DSM-IV-TR at 34.

signified "serious limitation in this area. The ability to function is severely limited but not precluded." (Tr. 541).

Dr. Jones found that plaintiff was slightly limited in his ability to understand, remember, and carry out short, simple instructions. (Tr. 541). Plaintiff was moderately limited in his ability to understand, remember, and carry out detailed instructions, and to respond appropriately to changes in a routine work setting. (Tr. 541-42). Finally, she found plaintiff was markedly limited in his ability to make judgements on simple work-related decisions, to respond appropriately to work pressures in a usual work setting, and to interact appropriately with the public, supervisors, and co-workers. (Tr. 541-42).

### IV.   <u>ALJ's Decision</u>

The ALJ made the following findings:

1.  Based on an application filed March 5, 1998, the claimant, in a post-hearing decision dated December 11, 1998, was found disabled beginning March 5, 1998 on the basis of a depressive disorder, a schizoaffective disorder, an antisocial personality disorder, headaches, and a history of alcohol and cocaine dependence in remission. The impairments did not meet or equal in severity the requirements of any Section of Appendix 1, Subpart P, Regulations No. 4, but they were sufficiently severe in combination to render the claimant incapable of performing any substantial gainful activity in significant numbers in the national economy, or any jobs on a consistent full-time basis, even at a sedentary level of exertion (Section 201.00(h), Appendix 2, Subpart P, Regulations No. 4). Substance abuse was found not to be a material factor in the determination of disability.

2.  The claimant possibly has not engaged in substantial gainful activity since March 5, 1998, but he had substantial recorded earnings from work for the period of time from July 2002 to May 2003.

3.  The medical evidence establishes that since January 1, 2003 the claimant has had a depressive disorder not otherwise specified, a personality disorder not otherwise specified, alcohol and drug use in good remission, and a number of physical impairments all minor in severity and/or controlled by medication, but no impairment or combination of impairments that meets or equals in severity the requirements of any impairment listed in Appendix 1, Subpart P, Regulations No. 4.

4.  The claimant's allegation of impairments, either singly or in combination, producing symptoms and limitations of sufficient severity to prevent the performance of any sustained work activity beyond the end of 2002 is not credible, for the reasons set out in the body of this decision.

5.  The claimant, since January 1, 2003, has had only slight abnormalities not significantly limiting the performance of any basic work activities. (20 CFR 416.920(c) and 416.921). The medical evidence establishes that there has been improvement in the claimant's medical impairments since December 11, 1998, and this improvement is related to the claimant's ability to work (20 CFR 416.994).

6.  The claimant's disability ceased on January 1, 2003 (20 CFR 416.994(b)(5)(viii)).

7.  The claimant has no substance use disorder that is uncontrollable and that prevents the performance of substantial gainful activity.

(Tr. 22).

**V.  Discussion**

The Social Security Administration may conduct periodic reviews to determine whether benefit recipients continue to be disabled. 20 C.F.R. § 416.989. Such reviews may be prompted, *inter alia*, if the SSA learns a recipient has returned to work or substantial earnings are reported to recipient's wage record. 20 C.F.R. § 416.990(b)(4)-(6). SSA also periodically reviews recipients whose impairments are expected to improve. 20 C.F.R. § 416.990(d).

The SSA asks the following questions when determining whether a disability continues:

1.   Is there an impairment or combination of impairments which meets or equals the severity of a listed impairment?

2.   If not, has there been a medical improvement?

3.   If there has been medical improvement, is it related to claimant's ability to work? . . .

5.   If medical improvement is shown to be related to claimant's ability to work, are all of claimant's current impairments in combination severe? This determination considers all claimant's current impairments and the impact of the combination of these impairments on claimant's ability to function. If the evidence shows that all claimant's current impairments in combination do not severely limit claimant's physical or mental abilities to do basic work activities, these impairments will not be considered severe in nature. If so, claimant will no longer be considered to be disabled.

6.   If claimant's impairment is severe, SSA will assess claimant's ability to do substantial gainful activity – SSA will assess claimant's residual functional capacity based on all current impairments and consider whether claimant can still do work he or she has done in the past.

7.   If claimant is not able to do work he or she did in the past, given the residual functional capacity assessment and considering claimant's age, education, and past work experience, can he or she do other work?

See 20 C.F.R. § 416.994(b)(5).

Medical improvement is "any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled. A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with

15

your impairment(s) (see § 416.928)." 20 C.F.R. § 416.994(b)(1)(I).
Symptoms are claimant's "own description" of "physical or medical
impairment." 20 C.F.R. § 416.928(a). Signs are "anatomical
physiological, or psychological abnormalities which can be
observed, apart from" claimant's own statements. 20 C.F.R. §
416.928(b).

> Signs must be shown by medically acceptable clinical
> diagnostic techniques. Psychiatric signs are medically
> demonstrable phenomena that indicate specific psychological
> abnormalities, e.g., abnormalities of behavior, mood, thought,
> memory, orientation, development, or perception. They must
> also be shown by observable facts that can be medically
> described and evaluated.

Id. Laboratory findings are "anatomical, physiological, or
psychological phenomena which can be shown by the use of a
medically acceptable laboratory diagnostic techniques," including
"psychological tests." 20 C.F.R. § 416.928(c).

## A.   **Standard of Review**

The court must affirm the Commissioner's decision, "if the
decision is not based on legal error and if there is substantial
evidence in the record as a whole to support the conclusion that
the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187
(8th Cir. 1997). "Substantial evidence is less than a
preponderance, but enough so that a reasonable mind might find it
adequate to support the conclusion." Estes v. Barnhart, 275 F.3d
722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d
1145,1147 (8th Cir. 2001)). The court may not reverse merely
because the evidence could support a contrary outcome. Estes, 275
F.3d at 724.

16

In determining whether the Commissioner's decision is supported by substantial evidence, the court reviews the entire administrative record, considering:

    1.   The ALJ's credibility findings;

    2.   the plaintiff's vocational factors;

    3.   the medical evidence;

    4.   the plaintiff's subjective complaints relating to both exertional and nonexertional impairments;

    5.   third-party corroboration of the plaintiff's impairments; and

    6.   when required, vocational expert testimony based on proper hypothetical questions, setting forth the claimant's impairment.

See Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992).

The court must consider any evidence that detracts from the Commissioner's decision. Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by substantial evidence. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)).

**B.   Plaintiff's Allegations of Error**

Plaintiff raises three issues: (1) the ALJ erred by giving little or no weight to the opinion of the treating physician, Dr. Krojanker, (2) the ALJ erred in discounting the medical opinion of the consultative examiner, Dr. Jones, because of a GAF score, and

(3) the ALJ's decision that plaintiff is not disabled was not based on substantial evidence.

### 1.  **Weight Given to Treating Physician's Opinion**

Plaintiff argues that the ALJ erred in giving little or no weight to the opinion of plaintiff's treating physician, Dr. Krojanker. The ALJ explained he gave little or no weight to Dr. Krojanker's opinion because (1) the claimant was being noncompliant with treatment recommendations, and (2) to the extent the ALJ found "Dr. Krojanker's assessment of the claimant's overall mental functioning to be credible. . . Dr. Krojanker admitted in his earlier clinical notes that some of the claimant's problems were due to 'cocaine and alcohol dependence.'" (Tr. 20). Therefore, the ALJ reasoned, the claimant would be ineligible for continuing medical disability benefits if the evidence established that claimant would not be disabled if he stopped using drugs and alcohol. (Tr. 20).

Plaintiff claims that Dr. Krojanker did not indicate whether plaintiff's compliance with "Rational Self-Activating Analysis Groups" (the noncompliance with treatment mentioned by the ALJ) could restore plaintiff's ability to work. Plaintiff argues that the ALJ should have contacted Dr. Krojanker for more information on the effect compliance with Rational Self-Activating Analysis Groups could have had on plaintiff's ability to work.

Defendant responds that the ALJ could reject medical opinions if they were inconsistent with the record as a whole. Defendant argues that Dr. Krojanker's opinion that the plaintiff remained

18

disabled and unable to work was contradicted by the reports of Dr. Mades and Dr. Jones, who both found plaintiff's condition had improved since 1998. Defendant claims Dr. Krojanker's opinion was also contradicted by plaintiff's actual ability to perform full-time work in 2002 and 2003.

Plaintiff replies that "work activity 'standing alone'" cannot justify a cessation of benefits. Reply Brief at 3. Plaintiff explains that the applicable standard is "whether there has been medical improvement in Plaintiff's impairments, whether any such improvement is related to Plaintiff's ability to work, and whether Plaintiff is currently able to engage in substantial gainful employment." Reply Brief at 3, citing 42 U.S.C. § 423(f)(1); 20 C.F.R. § 416.994(b).

Eighth Circuit law on this issue is as follows:

A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight. . . . In fact, it should be granted controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. . . . By contrast, "[t]he opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence."

Cunningham v. Apfel, 222 F.3d 496, 502 (8th Cir. 2000) (citations omitted).

This rule applies to opinions of treating psychiatrists and treating psychologists. See 20 CFR § 404.1527(a)(2) (referring to physicians, psychologists, and other treating sources).

"Whether the ALJ grants a treating physician's opinion substantial or little weight . . . the ALJ must 'always give good

reasons' for the particular weight given to a treating physician's evaluations." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000), citing 20 C.F.R. § 404.1527(d)(2).

The ALJ's function is "to resolve conflicts among 'the various treating and examining physicians.'" Bentley v. Shalala, 52 F.3d 784, 785 (8th Cir. 1994) (citations omitted). "While the opinions of treating physicians are entitled to special weight, they do not automatically control, since the record must be evaluated as a whole." Id. In Bentley, "two highly qualified mental health professionals with an equal opportunity to examine the claimant came to opposed conclusions as to his ability to work." Id. at 787. In this situation, "[w]here the medical evidence is evenly balanced . . . the ALJ resolves the conflict." Id.

Dr. Krojanker's treatment records show that plaintiff missed one appointment during a course of treatment that apparently exceeded two years. The record does not reflect any suggestion by Dr. Krojanker that this missed appointment was crucial to plaintiff's recovery, was a continuing concern, or affected plaintiff's ability to work. The Court finds that plaintiff's one missed appointment is not a "good reason" for giving little or no weight to Dr. Krojanker's opinion.

Plaintiff objects to the ALJ's second reason for giving little or no weight to Dr. Krojanker's opinion: that plaintiff's problems would cease if he discontinued substance use.  However, as plaintiff notes, the ALJ found that the medical evidence

20

established that plaintiff's alcohol and drug use was in good remission. (Tr. 22, Brief at 10).

The ALJ also found that the "preponderance of the medical evidence in recent years . . . indicates that the claimant's mental state is no longer significantly impaired, ongoing substance abuse or not." (Tr. 20).  The ALJ thus gave little or no weight to Dr. Krojanker's opinion in part because it was inconsistent with the preponderance of the medical evidence.

The Court finds that it was within the ALJ's discretion to resolve the conflicting assessments of plaintiff's mental health, and will not disturb the ALJ's decision that Dr. Krojanker's opinion was entitled to little or no weight.

### 2.   ALJ's Treatment of GAF Score in Consultative Physician's Report

Plaintiff argues that the ALJ erred when he placed too much weight on the GAF score of 65-70 provided by Dr. Jones. (Brief at 11). Plaintiff claims the ALJ should have given more weight to Dr. Jones's written findings, specifically those regarding plaintiff's functional limitations. Id. Plaintiff argues that the written findings regarding plaintiff's functional limitations represent "medical conclusions based on observed signs and symptoms," whereas the GAF score is "subjective." Id.

Psychiatrists and courts regularly refer to GAF scores as indicators of mental and occupational functioning. See, e.g., Lacroix v. Barnhart, 465 F.3d 881 (8th Cir. 2006); Bayliss v. Barnhart, 427 F.3d 1211 (9th Cir. 2005); Pollard v. Halter, 377

21

F.3d 183 (2d Cir. 2004); <u>Jones v. Commissioner of Social Sec.</u>, 336
F.3d 469 (6th Cir. 2003). The American Psychiatric Association
explains that the GAF score "is for reporting the clinician's
judgment of the individual's overall level of functioning." <u>DSM-
IV-TR</u> at 32. The GAF score is one of five axes in the multiaxial
system used to assess clinical disorders, personality disorders,
mental retardation, general medical conditions, and psychosocial
and environmental problems. <u>Id</u>. at 27. The Court finds that
assessing a GAF score is a medically acceptable clinical
diagnostic technique, and the ALJ's findings could reasonably be
drawn from the evidence, and thus were supported by substantial
evidence.

**VI.  <u>Conclusion</u>**

The ALJ's decision was not based on legal error, and there is
substantial evidence in the record as a whole to support to
conclusion that plaintiff's medical condition had improved.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff his
complaint and his brief in support of the complaint is **denied.**

A separate judgment in accordance with this order will be
entered this same date.

CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 13th day of March, 2007.

- 22 -